No. 45,492

STATE OF KANSAS, *Appellee*, v. MARVIN CLARENCE COLEMAN, *Appellant.*

(481 P. 2d 1008)

Opinion filed March 6, 1971.

*Brian J. Moline,* of Wichita, argued the cause, and *Ralph E. Gilchrist* and *Carl L. Buck,* of Wichita, were with him on the brief for the appellant.

*Wallace W. Underhill*, Deputy County Attorney, argued the cause, and *Kent Frizzell*, Attorney General, and *Keith Sanborn*, County Attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal in a criminal action wherein the defendant was convicted on two counts of robbery in the first degree under K. S. A. 21-527, and was sentenced to a term of not less than ten nor more than twenty-five years at hard labor in the state penitentiary on each count, the sentences to run consecutively.

The appellant contends the trial court erred (*a*) in failing to suppress evidence concerning his identification at a pretrial police line-up; and (*b*) in failing to grant a new trial on the ground he did not have an impartial jury.

The appellant herein, Marvin Clarence Coleman (also known as Jack L. Miller), was charged in two counts of first degree robbery arising from the following facts:

On the 16th day of January, 1968, a man wearing a tan colored trench coat walked into the Allis Hotel liquor store in Wichita, Kansas, between 10:15 and 10:30 p. m. He held his hand in his pocket and raised it up and indicated to the clerk, Bernice Beasley, that it was a gun and demanded money. She gave him $210 and he fled, but before leaving he told her to "Wait five minutes before you use the phone. I will be across the street and I can see you, and I will shoot you from there." When the man left the clerk called the police.

On the 20th day of January, 1968, a man wearing a similar trench coat entered the same liquor store about 6:20 p. m., and in the same manner demanded the money of the clerk, Susie Calvert. She gave him $77 and he turned and left.

Mrs. Calvert observed the man go north. She ran into the street shouting that she had been robbed and pointing at the man who had just robbed her. A colored employee of the Allis Hotel, Roosevelt McCormick, was leaving the lobby of the hotel when he heard the screaming of Mrs. Calvert and her cries for help.

At that time the man in the trench coat was very close to Mr. McCormick. McCormick and Ronald Regan, a man on the street, followed the robber north at a discreet distance. Both McCormick and Regan watched the robber remove his trench coat and place it in a recessed stairway between the Allis Hotel and another

building. The robber then went east with McCormick and Regan still in pursuit. Meanwhile, Mrs. Calvert had called the police.

While Regan and McCormick were following the robber in an easterly direction, two officers of the Wichita police department, who were in the vicinity and aware of the robbery, stopped the robber and attempted to question him, but the robber continued to walk. After some resistance he was placed under arrest and $77 in currency was taken from one of his pockets.

He was then taken to the Wichita police department where within a few hours a line-up was conducted, at which time Bernice Beasley, Susie Calvert and Roosevelt McCormick all identified him as the man who committed the robberies.

Prior to the trial of the case, counsel for the appellant moved the court for an order to suppress the evidence obtained from the police line-up held shortly after the appellant's arrest. The motion was denied.

The appellant contends the suggestive influences present when the police line-up was conducted for identification purposes failed to meet constitutional safeguards, citing *United States v. Wade*, 388 U. S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926; and *Gilbert v. California*, 388 U. S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951.

At the hearing on the motion conducted by the trial court out of the presence of the jury the testimony of various witnesses was taken, including that of the appellant. This hearing disclosed the following:

Don Myers, a detective on the vice squad of the Wichita police department for about fifteen years, was on duty the 20th day of January, 1968, when the appellant was arrested. At that time the appellant identified himself as Jack L. Miller. Officer Myers was conducting an investigation relative to the two robberies of the Allis Hotel liquor store and was in charge of the line-up at the Wichita police department. Prior to conducting the line-up the officer procured a waiver from the appellant wherein he waived his right to have counsel present at the line-up. The waiver was signed by Detective Barry Costello and by Officer Maninger. It also bore the signature of Mr. Jack L. Miller.

Officer Myers testified that all signatures to the waiver were affixed in his presence and that none of the officers threatened, coerced, promised or in any way forced the appellant, either physically or mentally, to sign the waiver.

At the time the other officers were signing the waiver Officer Myers was placing a call to the county attorney's office requesting the presence of Mr. Issinghoff, a deputy county attorney, during the time the line-up was conducted. Mr. Issinghoff honored the request and was present at the line-up.

Five persons were in the line-up, including the appellant. All except the appellant were police officers because there were no other prisoners in the police jail at the time. The five persons all had similar general physical characteristics as to size, weight and color of skin (white); none of them wore a tie; they wore shirts and trousers, except the appellant wore a dark brown jacket. None of the persons in the line-up was dressed in the same type clothing. The tan trench coat worn by the robber was recovered by the officers making the arrest, but it was not worn by any of the persons in the line-up or shown in any way to the witnesses at the line-up.

Photographs of the entire line-up taken at the time the witnesses observed the suspects were used by counsel for the appellant in cross-examination.

The appellant was kept in the vice office until the line-up was conducted, and none of the witnesses called to observe the line-up had seen the appellant in the custody of any officer prior to the line-up; no photographs of the appellant were available and none was shown to the witnesses prior to their identification; and the appellant was not booked prior to the line-up.

None of the witnesses called to observe the line-up personally knew any of the officers in the line-up. It was disclosed the appellant had a little blood on his face, but this did not show in the photographs taken of the line-up. Before the line-up the appellant was given an opportunity to wash and clean up but he refused.

It was also disclosed the appellant had approximately one day's growth on his beard, while the other persons in the line-up were clean shaven.

The witnesses called to observe the line-up were instructed prior thereto not to make any audible sound or to say anything until the line-up was over. They were instructed to talk only to the officer conducting the line-up. The witnesses were all in the same room when the line-up was conducted, but they were separated and not sitting close to one another.

At the trial three identification witnesses were called on behalf of the state. They positively identified the appellant.

Bernice Beasley in her report to the police on the night of the first robbery, January 16, 1968, described the robber as between 30 and 35 years of age. She made positive identification of him in the courtroom, and in describing what happened at the line-up, said:

"A. Well, they brought in five or six men and lined them up under the lights, and I knew the minute he walked in the door that he was the one.

"Q. Do you recall anything about the other five or six persons in the line-up?

"A. Very little. I mean, once I saw him, I knew he was the one."

Susie Calvert testified that when she was robbed as clerk of the liquor store in question on the night of January 20, 1968:

". . . I sort of badgered with him just a little bit before I gave him the money. He kept saying, 'I don't want to hurt you.' When he would do this and try to get me to hurry, he would squint and go like that at me. And this was the thing I remembered about him.

"Q. How long was he in the liquor store?

"A. Possibly five minutes."

Mrs. Calvert also remembered the appellant's hair. She said:

". . . His hair was rather long at the time, not the beatle type, long enough just to be full and brushed back and the front back."

Roosevelt McCormick identified the appellant as "The same man that I had been trailing."

At the trial counsel for the appellant did not explore the circumstances of the line-up identification when he cross-examined the two liquor store clerks and Roosevelt McCormick. Instead he cross-examined the two clerks as to their identification of the appellant at the preliminary hearing. Furthermore, we find nothing in the record showing that the appellant made an in-court objection to the identification testimony of the three witnesses during the trial. (*State v. Holsey*, 204 Kan. 407, 410, 464 P. 2d 12.)

In challenging the line-up the appellant contends:

"1. That there is evidence in the record that the technique used in the line-up was improper in that it was suggestive.

"2. That the waiver to right of counsel at the line-up was improper in that it was not freely and intelligently given."

In *United States v. Wade*, supra, after the accused had been indicted and arrested for robbery of a federally insured bank, and counsel had been appointed to represent him, an F. B. I. agent, without notice to the accused's counsel, arranged to have two

bank employees observe a line-up of the accused, and five or six other prisoners. In the opinion the court said:

"Since it appears that there is grave potential for prejudice, intentional or not, in the pretrial lineup, which may not be capable of reconstruction at trial, and since presence of counsel itself can often avert prejudice and assure a meaningful confrontation at trial, there can be little doubt that for Wade the post-indictment lineup was a critical stage of the prosecution at which he was 'as much entitled to such aid [of counsel] . . . as of the trial itself.' *Powell v. Alabama*, 287 U. S. 45, 57. Thus both Wade and his counsel should have been notified of the impending lineup, and counsel's presence should have been a requisite to conduct of the lineup, absent an 'intelligent waiver.' See *Carnley v. Cochran*, 369 U. S. 506. No substantial countervailing policy considerations have been advanced against the requirement of the presence of counsel. Concern is expressed that the requirement will forestall prompt identifications and result in obstruction of the confrontations. As for the first, we note that in the two cases in which the right to counsel is today held to apply, counsel had already been appointed and no argument is made in either case that notice to counsel would have prejudicially delayed the confrontations. . . ." (pp. 236, 237.)

The appellant's assertion that the waiver he gave to the police officers on the night in question was not freely and voluntarily given is based upon the contention that he was intoxicated. This is his primary concern on appeal. During the examination of the appellant in support of his motion to suppress, he was asked if he had been drinking. He replied that he had but "I wasn't so far gone that I didn't realize what I was doing, but I was drinking."

The trial court, after hearing all the evidence presented on the motion to suppress, made the following finding:

". . . the Court will enter a finding that right to counsel was intelligently waived by this Defendant. By his own testimony, I think his exact words were that 'I had been drinking, but I was not so far gone that I didn't know what I was doing;' and that the waiver was executed without any threats or coercion or any promise made to him to secure such."

Here the trial court's finding that the appellant knew what he was doing when he signed the waiver is supported by substantial evidence and must be upheld. (*State v. Shaw*, 195 Kan. 677, 678, 408 P. 2d 650.) Under our interpretation of *Wade*, the appellant made an intelligent waiver of his right to have counsel present at the line-up. In *Wade* the accused was already indicted and had counsel when the line-up was conducted, but his counsel was not notified. Here the appellant had neither retained counsel nor appointed counsel at the time the line-up was conducted and no charges had been filed, but he executed an intelligent waiver of his

right to have counsel present, which the trial court on all the evidence found to have been freely given.

Assuming the *Wade* and *Gilbert* cases are applicable to a line-up confrontation at the investigatory stage of the case, as here (but see *State v. Griffin*, 205 Kan. 370, 374, 469 P. 2d 417), the appellant's intelligent waiver of counsel at such confrontation does not disclose a situation falling within their ambit. No constitutional right having been infringed by the absence of counsel at the line-up, in-court identifications which may have been based upon such line-up confrontation are admissible in evidence.

The appellant's suggestion, that the technique used in the line-up was improper in that it was suggestive, is not substantiated either by the facts presented to the trial court or the argument which he presents on appeal. The situation closely parallels the line-up discussed in *State v. Griffin*, supra. There after considerable discussion of the facts this court said:

"Under the circumstances shown to exist, we believe the record clearly evidences a conscientious effort on the part of the police officers to afford due process of law and to protect the constitutional right of defendant. Even though the need for early identification [was] clearly indicated, the police took the time and trouble to arrange a lineup, rather than to pursue the less dependable method of showing suspects singly to persons for identification.

"There is nothing in this record concerning the lineup confrontation that indicates anything unnecessarily suggestive or conducive to the irreparable mistaken identification warned against in *Stovall v. Denno*, supra [388 U. S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967]." (p. 375.)

The prejudice to an accused in a criminal case from an improperly conducted line-up was expressed by the Supreme Court in *United States v. Wade*, supra, as follows:

"The few cases that have surfaced therefore reveal the existence of a process attended with hazards of serious unfairness to the criminal accused and strongly suggest the plight of the more numerous defendants who are unable to ferret out suggestive influences in the secrecy of the confrontation. We do not assume that these risks are the result of police procedures intentionally designed to prejudice an accused. Rather we assume they derive from the dangers inherent in eyewitness identification and the suggestibility inherent in the context of the pretrial identification. . . ." (pp. 234, 235.)

The appellant directs our attention to the fact that there was blood on the appellant's face or nose when he appeared in the line-up and none on the others in the line-up; that the men in the line-up did not have on similar clothing to the appellant; and that the officers were clean shaven and the appellant had at least a day's

growth of beard. It is argued the cumulative effect of these discrepancies were such as to make the appellant obviously distinctive from the other men in the line-up.

The appellant cannot be heard to assert the fact there was blood on his face because he refused to wash the blood from his face when requested prior to the line-up.

In the *Wade* and *Gilbert* cases the Supreme Court of the United States was striking at *the secrecy* of a line-up confrontation which made it impossible for the accused's counsel to reconstruct and ferret out suggestive influences in the identification process of an accused.

The trial court here was aware of all the circumstances attendant upon the line-up. Photographs of the line-up were examined by counsel for the appellant, but he declined to pursue the examination of the identification witnesses on cross-examination concerning the points which he now asserts as suggestive influences. He made no objection to the in-court identification testimony. The record presented by the appellant fails to disclose that the line-up procedure was either suggestive or that it improperly influenced any identification witness who testified at the trial.

The facts gleaned from the record clearly indicate the police officers who conducted the line-up herein made a conscientious effort to protect the constitutional rights of the appellant. Under the facts and circumstances presented by the record herein, we cannot say the trial court erred in failing to suppress evidence concerning the appellant's identification at the police line-up.

The appellant next contends he was denied a trial by an impartial jury.

This charge stems from the conduct of Mack Brooks, one of the jurors. The facts are that Bob Decker, an inmate of the Sedgwick county jail, was short of funds for cigarettes. He had requested his brother to bring money to him. His brother was unable to deliver the money and requested Mack Brooks, a friend, to take $20 to Mr. Decker. This occurred sometime prior to the trial when both Decker and the appellant were inmates at the Sedgwick county jail. When Brooks delivered the money he was told by Decker to deposit $10 at the desk to his account and $10 to the account of Marvin Coleman, from whom Decker had borrowed some money. Brooks was fully repaid the $20 by Decker's brother for this courtesy.

Brooks dismissed the incident from his mind. He had never

known Coleman and had actually forgotten, when questioned on *voir dire* examination, that the appellant was the same person as the one for whom he had deposited $10 in the Sedgwick county jail.

During the course of the trial Decker, who was still in the county jail, placed a call to the home of Brooks requesting to see him. When Brooks returned the call he was requested by Decker to come to the jail to see him. Decker then informed Brooks he was on Coleman's jury, and that Coleman was going to use the matter if he was found guilty.

Thereupon Brooks, not knowing what to do, went to the sheriff of Sedgwick County and informed him of the facts. The matter did not arise until it was presented on the motion for a new trial. Juror Brooks and the jury foreman were summoned to testify.

Their testimony was that the incident did not affect the verdict of the jury in any way. Brooks testified the matter did not influence his judgment either for or against the appellant, and the foreman of the jury testified there were no irregularities whatever in the jury room concerning the matter.

The Sixth Amendment to the United States Constitution requires that "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." The amendment prescribed no specific test. "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." (*Irvin v. Dowd,* 366 U. S. 717, 722, 6 L. Ed. 2d 751, 81 S. Ct. 1639.) It is generally held that an impartial juror is one who is free from bias. (*Durham v. State,* 182 Tenn. 577, 188 S. W. 2d 555.) "The bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as matter of law." (*United States v. Wood,* 299 U. S. 123, 133, 81 L. Ed. 78, 57 S. Ct. 177.)

While the foregoing Federal Supreme Court cases have undertaken to define bias as contemplated under the Sixth Amendment which guarantees the accused in a criminal case a fair trial by an impartial jury, there is nothing in the record here showing bias on the part of Juror Brooks which prevented him from serving as an impartial juror. Therefore, these cases, upon which the appellant relies, have no application. (See § 10, Bill of Rights of the Constitution of the State of Kansas.)

In *State v. Dearman,* 203 Kan. 94, 453 P. 2d 7, cert. denied 396 U. S. 895, 24 L. Ed. 2d 173, 90 S. Ct. 194, this court said:

".   .   . A trial court's decision as to the qualification of a juror will not be disturbed on appeal, unless disqualification appears as a matter of law or there has been an abuse of discretion.   .   .   ."   (p. 98.)

On the record here presented we cannot say the trial court abused the exercise of its power of discretion in denying the appellant's motion for a new trial.

The judgment of the lower court is affirmed.