STONE v. UNITED STATES, and four
*other cases.*

Nos. 8273-8277.

Circuit Court of Appeals, Sixth Circuit.

June 27, 1940.

Arthur Brothers, of New York City (Lee, Cox & Hier, of Knoxville, Tenn., on the brief), for appellants Elias T. and Harold Stone.

C. W. Key, of Knoxville, Tenn. (Kennerly & Key, J. H. Doughty, and W. C. Burton, all of Knoxville, Tenn., on the brief), for E. T. Shaw and John G. Anderson.

W. Hoyle Campbell, of Knoxville, Tenn., for Sam G. Kennedy.

James B. Frazier, Jr., of Knoxville, Tenn., and H. T. Nichols, of Atlanta, Ga. (James B. Frazier, Jr., of Knoxville, Tenn., on the brief), for appellee United States.

Before SIMONS, ALLEN, and HAMILTON, Circuit Judges.

HAMILTON, Circuit Judge.

These are separate appeals from judgments of conviction in which each appellant was ordered to serve a term of seven years.

Elias T. Stone and Harold F. Stone, appellants in Nos. 8273 and 8274, were tried and convicted on thirteen indictments containing thirty counts; John G. Anderson, appellant in No. 8275, was tried and convicted on eight indictments containing seventeen counts; E. T. Shaw, appellant in No. 8276, was tried and convicted on nine indictments containing thirteen counts, and Sam G. Kennedy, appellant in No. 8277, was tried and convicted on four indictments containing nine counts.

The charges against appellants involve fraud in the sale to the public of the capital stock of two corporations, i. e., Television & Electric Corporation of America and Television & Projector Corporation of America.

Appellee charged that appellants had violated Section 5(a) (1) of the Securities Act of 1933, Sec. 77e(a) (1), Title 15, United States Code, 15 U.S.C.A. § 77e(a) (1), which reads as follows:

"Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

"(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell or offer to buy such security through the use or medium of any prospectus or otherwise."—and Section 17(a) (1) of the Securities Act of 1933, Section 77q(a) (1), Title 15, United States Code, 15 U.S.C.A. § 77q(a) (1), which reads as follows:

"It shall be unlawful for any person in the sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud."—and also Sections 88 and 338 of Title 18, United States Code, 18 U.S.C.A. §§ 88, 338.

Appellants, Elias T. Stone and Harold F. Stone, assign fifteen errors, John G. Anderson, fourteen, E. T. Shaw, twelve, and Sam G. Kennedy, eighteen.

By briefs, appellants exhibit a clear statement of the points of law or fact to be discussed with proper reference to the record pages and the authorities relied on only as to the following errors:

1. Lack of evidence to sustain the charges;

2. A fatal variance between the averments of the conspiracy indictments and the evidence;

3. The verdict of the jury was vitiated by an unsuccessful attempt to bribe one of its members; and

4. Denying appellant, Sam G. Kennedy, motion for severance and continuance.

It is assumed that appellants have abandoned all others and in any event they need not be considered because of failure to comply with Rule 21 of Revised Rules of this court. I. T. S. Rubber Company v. Essex Rubber Company, 272 U.S. 429, 432, 47 S.Ct. 136, 71 L.Ed. 335; Eastman Kodak Company v. Southern Photo Materials Company, 273 U.S. 359, 369, 17 S.Ct. 400, 71 L.Ed. 684; Kahn v. United States, 6 Cir., 20 F.2d 782; Hyney v. United States, 6 Cir., 44 F.2d 134.

Prior to 1932, the Television & Electric Corporation of America, organized under the laws of the State of Delaware, with John L. Lyons, president, and Samuel S. Torrisi in charge, maintained and operated an experimental laboratory at No. 12 Elm Street, New York City, developing and perfecting various inventions of Torrisi for some of which patent applications were pending. The primary purpose of the corporation, so far as material, was designing and inventing television reception sets. It was authorized under its charter to issue 1,000,000 shares of stock, par value $1, a block of which was transferred to Torrisi for his discoveries, and M. J. Hoey & Company, stockbrokers of New York, were employed as underwriters and distributors of the remaining shares.

John J. Lyons, brother-in-law of M. J. Hoey, served as president and the organization minutes show that William L. Edison, son of the famous inventor, had consented to serve as director and consulting engineer.

In February, 1932, appellant, Sam G. Kennedy, a stock salesman engaged in business in Tennessee and contiguous states, read Hoey's advertisements of the sale of the stock of the Television & Electric Corporation of America and bought for resale, 500 shares from Hoey & Company.

Kennedy had a controversy with Hoey and wrote Stone & Company, an over-the-counter brokerage firm of New York City, with which appellants, Elias T. Stone and

Harold F. Stone, his son, were associated, requesting them to obtain for him additional shares of said stock and was advised the matter would be investigated and his requirements met if possible. Shortly thereafter, appellant, Elias T. Stone, called upon Torrisi and, as a result of negotiations, on September 22, 1932, a contract was entered into between the Television & Electric Corporation and Stone & Company, by the terms of which the latter agreed to purchase 40,000 shares of the Television stock to be delivered over a period of two years. The contract was discontinued with Hoey & Company. Torrisi gave to Stone & Company a copy of the prospectus theretofore used by Hoey & Company in the sale and distribution of the corporation's stock and additional data, from which Stone & Company prepared a new one.

Thereafter, appellants, Elias T. Stone and Harold F. Stone, doing business as Stone & Company, sent through the mails the prospectus and various pamphlets concerning the value of the stock and launched a campaign for its sale. Between November 30, 1932 and May 3, 1934, Stone & Company acquired from the corporation, for resale, 29,000 shares of its stock, for which it paid from 15 to 30 cents per share, or an average price of 20.9 cents, a total of $6,070.00. The appellant, Sam G. Kennedy, acquired for resale, 7,247 shares from Stone & Company for $8,925.28, or an average of $1.231 per share.

During the latter part of 1934, Kennedy associated with him, appellants, John G. Anderson and E. T. Shaw, in the sale of the stock and, together, they resold these shares to numerous persons, using the prospectus prepared and distributed by Stone & Company. Shares of the stock were sold in twenty-six states of the Union and in two foreign countries. Efforts to sell were abandoned May 25, 1936, at the request of the Securities & Exchange Commission. While the sale by Stone & Company of the Television & Electric Corporation stock was being investigated by the Securities Exchange Commission, the Television & Projector Corporation was organized under the laws of New York in March, 1936, with appellant, Elias T. Stone, one of its promoters, as president. Its alleged purpose was to manufacture and place on the market an automatic radio tuning device, invented and patented by Joseph La Via, also one of its promoters and organizers.

This corporation acquired a 90-day option, which was never exercised, to purchase the plant and business of the Coxsackie Manufacturing Company, of Coxsackie, New York, engaged in the manufacture of motion picture projecting machines, and in straitened financial circumstances. The Television & Projector Corporation had authorized capital of 150,000 shares of Class A, non-voting stock, par value $1.00, and 50,000 shares of Class B voting stock, par value $1.00. It was authorized to sell 80,000 shares of Class A and 20,000 shares of Class B which it offered at $1 per share on March 25, 1936, through Stone & Company.

Appellants, Elias T. Stone and Harold F. Stone, employed Gerald Abbott to prepare a prospectus for the company, which he did with data furnished in part by the Stones, and filed it with the Securities and Exchange Commission, pursuant to the Securities Act of 1933, § 2, as amended, 48 Stat. 905, 15 U.S.C.A. § 77b, but no registration statement was filed. Section 6 of the Act, 48 Stat. 78, 15 U.S.C.A. § 77f.

Sixteen thousand two hundred sixty (16,260) shares of the Projector Corporation stock were sold by Stone & Company, for which the corporation received $8,541.08, or approximately 52 cents per share. The appellants, John G. Anderson and E. T. Shaw, acquired a part of this stock from Stone & Company, for approximately 90 cents per share and resold it for $10 to $15 per share.

During the time the stocks of the respective corporations were being sold, their current financial condition, the value of their assets and the prospects of future earnings, based on facts then existing, were known personally to the appellants, Elias T. Stone and Harold F. Stone. The statement was made in some of this advertising literature that the Television & Electric Corporation was the pioneer in developing and making for practical use in the home, television reception sets without magnification, showing a direct television screen picture, 12″ x 12″ in size, composed of 60 lines, 20 pictures to the second.

It was represented that the most popular television set then in use was the scanning disc type, not larger than four square inches, and therefore useless for most practical purposes and that the next important similar device was the lens disc

type which projects the picture on a screen, the cost of which was prohibitive, ranging up to $500, and that the price of the lamp, alone, a part of this device, ranged up to $200. Further representations were made favorably comparing the cost of the present device with that of others for similar purposes.

In the same circular it was stated that the corporation could manufacture and sell its device to the retail consumer for less than $200 complete, and its operating brilliance was so great it could be operated satisfactorily in daylight.

Representations also were made that the stock of the corporation had an unusual speculative value with an immediate investment return as a going business; that the corporation was then engaged in the profitable manufacture of small radios; and that its assets consisted mainly of patents, copyrights, claims, inventions, processes, equipment and good will; and that it was free from liabilities, other than current operating and developing expenses.

There is evidence that the corporation possessed no practical or feasible television device or method for making one or that it had any capital for development in this field. It was not making radios and had no actual or prospective earnings for any return on investments in its stocks.

During the stock-selling period, it had not developed, and did not own, any practical television set and there was no such set in general use at any price, and it owned no patents on any television device.

The prospectus circulated by appellants, Elias T. Stone and Harold F. Stone and used by the other appellants in promoting the sale of the stock in the Television and Projector Corporation, stated that the corporation was to be engaged in the business of manufacturing and distributing the "widely known 'Superior Motion Picture Projector' also in the development and production of Television Receiving Sets and Radio Sets and Appliances, thus combining the three essential vehicles of sight and sound display for entertainment and commercial purposes."

In other parts of the prospectus, there is portrayed, by photographs, projecting machines, automatic tuning devices and television sets, and it is stated in plain and unambiguous language that these devices are being manufactured in the Coxsackie Manufacturing plant at Coxsackie, New York, and a photograph of the plant is in the prospectus with a statement in plain language that it belongs to the Television and Projector Corporation. It is also stated the corporation intended to produce a radio set including the automatic radio tuning device as an added feature at an approximate cost of $30 per set including all material, labor, overhead, sales and advertising expenses, which was to be sold to the distributors complete at about $36 with a net profit per set of approximately $6; that it also intended to produce a higher priced "DeLuxe" set containing the automatic radio tuning device feature to sell to the distributors at around $75 and at cost of manufacture of approximately $60, at a profit of about twenty per cent. The tuning device sold separately for attachment to standard sets to distributors at a cost of about $12 with an estimated production cost of about $7 showing a contingent profit of over forty per cent.

There is evidence that each of the appellants represented that the stock of the respective companies was one of the most attractive investments offered to the public and one of the best opportunities for large returns in dividends and that the appliances were then being manufactured by commercially operating companies and further that they were ready for immediate commercial use, no obstacle remaining in the way. The evidence shows that these statements were substantially untrue.

■ Appellants do not seriously contend that the statements made concerning the value of the securities were true, but each denies that he was lying. Each urges on us that he may have spoken falsely, but what was said untruly was reputed to be true to him, because he relied on reputed facts furnished from reliable sources. Each says he invented no fact which was put into circulation by him or that he wilfully disguised any fact with the intent to defraud or deceive prospective purchasers of the stock. Their real contention is good intent and good faith. Of course, in every agreement like these charged, there must be an intent on the part of the person who attempts or performs it, to do that which is unlawful. A question of intent usually resolves itself into one of fact. We arrive at one's intention by taking hold of certain circumstances, extraneous though they may be, and reasoning out the purpose in doing the act. It is a mental process, but a man's intention is really a question of fact to be arrived at by the trier of the facts in the

exercise of reasonable discretion, after considering all the circumstances connected with the act charged. Whatever result reasonably flows from an act is presumed to have been intended by the person who did it.

Much has been said as to the good faith of each of the appellants. Of course, it is the law that if each acted in good faith in the honest belief that what each of them said was true, or, if any one of them so acted, his honest belief condones his misstatements, and the making of the false statements which he believed to be true, would excuse him, but as affecting intent or good faith, ignorance of facts set up as defense is unavailing where the defendant, by the exercise of due diligence, could have become aware of his mistakes, especially where others may suffer a loss by his misstatements. Of course, if any particular appellant were ignorant of facts from the knowledge of which alone, fraudulent intent could be inferred, he cannot be convicted of a violation of the present statutes, unless his ignorance resulted from failure to exercise such discretion in ascertaining the facts as would be expected of a reasonably prudent person.

Where guilty knowledge is an element in the offense, as in conspiracy charges and the use of the mails to defraud, the knowledge must be found from the evidence beyond a reasonable doubt, but actual knowledge is not required; it may be inferred. Scienter may be inferred where the lack of knowledge consists of ignorance of facts which any ordinary person under similar circumstances should have known. Ignorance of inculpatory facts is no more a defense than ignorance of inculpatory law. There is evidence that each of the appellants knew, or could have known by the exercise of reasonable diligence, that the statements made to prospective purchasers concerning the value of the stocks of the respective corporations were false.

A study of the testimony convinces us that the issues were properly for the jury under the indictments charging a conspiracy to violate 18 U.S.C.A. § 338 by using the mails in furtherance of a scheme or artifice to defraud, and of the several substantive offenses charged under this section. The detailed transactions lending support to the accusations elaborately discussed both on the trial and on these appeals, are too numerous for separate consideration and we must content ourselves with touching only on those heretofore stated.

Count 2 of indictment No. 12937 and count 2 of indictment No. 12941 involving the sale of the stock of the Television & Projector Corporation were drawn under Section 5(a) (1) of the Securities Act of 1933, 15 U.S.C.A. § 77e(a) (1), the gravamen of the offense charged being the failure to file, with the Securities and Exchange Commission, a registration statement as required under the provisions of the act, and therefore unlawfully, feloniously and wilfully using the mails for the purpose of sale and delivery of the securities.

It is conceded by the appellee that there was filed with the Securities and Exchange Commission a prospectus relating to the issue of securities of the Television & Projector Corporation and by appellants that no registration statement was filed pursuant to the provisions of the act. It is insisted by the appellants that the offering of these shares was not in excess of $100,000 and for that reason they were exempt from registration under the act, so that there is a fatal variance between the averments of the conspiracy indictments and the evidence.

Section 3(b) of the Act, 15 U.S.C.A. § 77c(b), provides in substance that the Commission may at intervals, by its rules and regulations and subject to the terms and conditions therein prescribed, add any class of securities to those exempted, if it finds that the enforcement of the title with respect thereto is not necessary in the public interest and for the protection of investors, because of the small amount involved or the limited character of the public offering, but no issue offered to the public exceeding $100,000 shall be exempted.

Pursuant to this section, the Commission promulgated Rule 202, which conditionally provides exemptions among which are (1) that the total aggregate offering price of the securities to the public shall not exceed $100,000; (2) that the net proceeds realized by the issuer, after deducting all distribution expenses, shall not be less than 75% of the offering price to the public; (3) that a prospectus containing certain required information be given to the purchaser, either prior to or at the time of the sale of the security. There is evidence that conditions (2) and (3)

were not complied with by appellants in the sale and distribution of the stock. This being true, the securities did not fall within the statutory exemption, and it follows appellants' contention is without merit.

During the trial, after proper admonition not to converse about the case during recesses and adjournments, the jury was permitted to separate. After about thirty witnesses had testified, it was brought to the attention of the presiding judge that there had probably been an effort to bribe one of the jurors, and thereupon the judge called all the appellants and their counsel into his chambers and advised them of the report he had received as to the attempted bribery. By the consent of all the parties and their counsel, the judge, alone except for the presence of a court reporter, examined the juror, who stated that Charles R. Calloway, an attorney, formerly an office associate of one of the attorneys for appellant, E. T. Shaw, which association was known to the approached juror, told the juror on the street during a court recess that he wanted to talk to him sometime during the afternoon. The juror, trying to avoid Calloway, went to his father's office but was followed and again approached and asked by Calloway if he wanted to make some money, to which he gave a negative answer. Calloway then reminded the juror that he was serving in the present case and if he would listen to him another member of the jury would probably join him in Calloway's request.

The juror immediately reported the incident to the court and, under oath, stated that he had talked to no one else concerning the subject of the conversation and so far as he knew, no other member of the jury had been approached. He stated he knew Calloway well and had seen him with an attorney for one of the defendants on the street during the trial. The court admonished the juror to talk to no one else about the occurrence and the juror stated that he was open-minded and in a position to decide the case on the law and evidence as though the incident had not occurred. The judge called the respective parties and their attorneys to his chambers and read the juror's statement to them. Thereupon, the attorney for appellee suggested that the juror be excused and one of the alternates substituted, and that a statement be made to the jury that the juror was discharged at his request, without making known any other reason, to which appellants, by counsel, refused to agree.

The court then convened and swore the jurors to answer questions and made to them substantially the following statement: There is no inference to be drawn from anything the court may ask as to any occurrence, as it indicates nothing except that I am interested in finding out the matters about which I wish to inquire of you. When the case started I warned you that there was always a possibility that someone, through inadvertence, might make some statement that would be overheard by the jury, or that something might occur which would tend to prejudice the jury in the trial. The jury and the judge of the court are concerned in reaching a decision in this case solely on the law and evidence without anything occurring prejudicial either to the Government or the defendants. In order to clarify the situation, I desire to ask you a few questions.

He then separately asked each juror, other than the one approached, if anything had occurred that would tend to prejudice him or whether any one had undertaken to discuss the case with him, or make any suggestions about any course he might follow, either representing the government or the defendants, any government agent, or witness or anyone else. Each answered in the negative.

At the conclusion of the interrogation, the judge stated to the jury substantially the following: I understand from you that no one has contacted any one of you or made any statements in your presence in respect to this case. This applies to the prosecution, to the defendants, to the witnesses, to the bystanders or any source. I understand you all to say, all who have been asked and answered, that nothing has occurred along the line indicated that would in any way make it difficult or impossible for you to decide this case solely on the law and evidence. I thought it best to explore the situation to see if the court had wisely permitted the jury to go at large without being in charge of an officer.

The court then gave the usual admonition as to conversations or statements within the hearing of the jury and their duty to report such occurrences, if any, to the court. The appellants, out of the presence of the jury, moved to declare a mistrial on the ground that they had been prejudiced by the contact of an outsider with one of the jurors and by the exploration of the matter by the court and stated that, since it was apparent they had nothing

whatever to do with the alleged improper approach, their rights had been prejudiced and it was impossible for them to obtain a fair and impartial trial. They claimed that suspicion was aroused in the minds of all the remaining jurors that the one who was not questioned by the court was the one improperly contacted on behalf of some one of the defendants, thereby raising suspicion in all of their minds as to which defendant had instigated such improper action, and that the trial judge's exploration of the matter in open court had the effect of coercing the jurors and depriving them of their independent judgment in deciding the case. The motion was overruled, and after judgment, motion for a new trial was also overruled.

It is conceded that the misconduct of Calloway was not the result of any corrupt or improper influence practiced on the part of the Government, nor of appellants or their counsel, nor of anyone acting on behalf of any one of them.

The present error is of more serious character than superficially would appear. Trial by jury is one of the most vital elements in the administration of justice so far as the average citizen is concerned.

 When charged with a public offense, the defendant and the government each depends upon the jury exclusively for a weighing of the facts and when these are once determined by a jury verdict, no other tribunal may re-examine them. Faith in the courts and in the jury system must be maintained and it is proper that on questions such as we have here the rule should be such as to support the faith of all litigants in our judicial system and, as part thereof, trial by jury. That faith can be sustained only by keeping our judicial proceedings free from the suspicion of wrong. The question is, not whether any actual wrong resulted from the conversation of Calloway with the juror under the circumstances related, but whether it created a condition from which prejudice might arise or from which the general public would suspect that the jury might be influenced to reach a verdict on the ground of bias or prejudice. When the judgment is weak, prejudice is strong, and it is essential to faith in the jury system that jurors should determine the facts submitted to them wholly on the evidence offered in open court, unbiased and uninfluenced by anything they may have seen or heard outside of the actual trial of the case.

There is no right more sacred than the right to a fair trial. There is no wrong more grievous than its negation. The courts have exercised some discretionary power in dealing with the conduct of juries while not in improper communication with other persons and have not always disturbed verdicts for misconduct which were the result of the uninfluenced action of jurors alone, (Klose v. United States, 8 Cir., 49 F.2d 177) but when jurors have communications with strangers, the case is different and cannot be dealt with so easily.

 The rule of the common law was so strict that jurors were required to be kept, not only secluded, but fasting while in consultation. The rule is not now so harsh but the object of a jury trial would be subverted if they were allowed to communicate with other persons, or other persons to communicate with them, unless for some purpose of necessity and in the presence of the court.

 Any course is clearly illegal which would expose them to the danger of influence outside the court. If a single juror is improperly influenced, the verdict is as unfair as if all were. The presumption is always in favor of good character but the law concerning juries provides strictly that all jurors be secluded from outside influences and presumes that such influence may act upon some of them, and may act so as to be beyond detection.

Jurors are human and not always conscious to what extent they, are in fact biased or prejudiced and their inward sentiments cannot always be ascertained. In the present case, the juror commendably showed anxiety at the approach to him concerning the case and whether he leaned one way or the other because of the occurrence, is beyond ascertainment. The whole jury was exposed to, and actually encountered, an outside disturbance. Each, except the one approached, was interrogated in his presence about outside influences and while no inquiry can be made as to what occurred while the jury was deliberating, it takes no more than an ordinary observation of human nature to realize the suspicion in the minds of the jurors that something had happened extraneously in the course of the trial to influence their deliberations.

 The improper communication with the juror in the present case raises the presumption that the rights of appellants

were prejudiced and there is no showing on the part of appellee that no injury could have occurred by reason of the irregularity. Mattox v. United States, 146 U.S. 140, 151, 13 S.Ct. 50, 36 L.Ed. 917.

We are of the opinion the appellants' motion to discharge the jury should have been sustained. This conclusion makes it unnecessary to consider the assignment of error of appellant, Sam G. Kennedy, of the court's refusal to grant him a continuance and severance.

Judgments reversed and cause remanded for a new trial consistent with this opinion.