**UNITED STATES of America, Plaintiff-Appellee,**

v.

**George F. VASEN, Defendant-Appellant.**

**No. 11209.**

United States Court of Appeals, Seventh Circuit.

April 15, 1955.

Rehearing Denied June 3, 1955.

Finnegan, Circuit Judge dissented.

Joseph F. Burns, Chicago, Ill., Maurice J. Walsh, Chicago, Ill., of counsel, for appellant.

Robert Tiel en U. S. Atty., Edward J. Calihan, Jr., Asst. U. S. Atty., Chicago, Ill., John P. Lulinski, Chicago, Ill., of counsel, for appellee.

Before MAJOR, FINNEGAN and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

Defendant was convicted upon nine counts of an indictment charging use of the mails in carrying out a scheme to defraud, by selling fraudulent fractional undivided interest in oil, gas and other mineral rights in violation of Section 77q(a) of the Securities Act, Title 15 U.S.C.A. He was sentenced upon certain counts to five years in the custody of the Attorney-General and ordered placed on probation for a period of five years, following his release from custody, upon others. On appeal he assigns error as follows: (1) he was deprived of a fair trial by certain remarks of the court to the jury; (2) certain evidence was improperly admitted; (3) the court erroneously charged the jury. The record reflects no timely objection in the trial court upon any of these points.

██ Rule 30 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., prescribes the time and place for making objections to instructions. In the absence of compliance with this rule, defendants are precluded from reviewing the action of the court. United States v. Kaadt, 7 Cir., 171 F.2d 600; see also United States v. Sutter, 7 Cir., 160 F.2d 754. Other courts have consistently decided likewise. See Felton v. United States, 83 U.S.App.D.C. 277, 170 F.2d 153, certiorari denied 335 U.S. 831, 69 S.Ct. 18, 93 L.Ed. 385; Bartlett v. United States, 10 Cir., 166 F.2d 920. This rule is, in its essence, the same as that of Rule 51 of the Rules of Civil Procedure, 28 U.S.C.A., as to which it has repeatedly been declared that the purpose of requiring objections is to insure that the trial judge may be advised of possible errors upon his part and to give him an opportunity to correct them. For this reason, any objection must be fairly and promptly directed to the trial court in order that errors may be avoided. Stilwell v. Hertz Drivurself Stations, 3 Cir., 174 F.2d 714; Hower v. Roberts, 8 Cir., 153 F.2d 726; Williams v. Powers, 6 Cir., 135 F.2d 153. In other words the court must be given opportunity to rectify any inadvertent wrongful charge, statement or ruling. Allen v. Nelson Dodd Produce Co., 10 Cir., 207 F.2d 296; Green v. Reading Co., 3 Cir., 183 F.2d 716. This reasoning applies to every instance of assigned error where the action of which complaint is made is such that, if called to the court's attention, it might have been corrected. This includes rulings in the course of the trial, comments of the court and instructions to the jury. In all such instances common fairness requires that before it can be successfully contended on appeal that the trial court has erred, that court must have been given an opportunity to rectify any inadvertent comment, ruling or instruction. It follows from the record in this case that defendant, inasmuch as he preserved no timely objection to any action on the part of the trial court of which he now complains, is without right to invoke this court's jurisdiction to consider the assigned errors, unless they be of that serious character condemned by Rule 52(b), of the Rules of Criminal Procedure, 18 U.S.C.A.

██ Under Rule 52(b) plain errors "affecting substantial rights may be noticed" although not brought to the attention of the trial court. We remarked in United States v. Raub, 7 Cir., 177 F.2d 312, at page 315: "Such errors must, however, be substantial and capable of resulting in miscarriage of justice to warrant the reversal of a judgment of conviction based on ample evidence. We must not lightly invoke Rule 52(b)."

And when issues have, on the whole been left to the jury in substantial compliance with the applicable law, we will not notice an error which the trial judge has not been asked to correct unless substantial rights have been adversely affected; that is to say, only seriously prejudicial error will be noticed, in the absence of objection. United States v. Kirby, 2 Cir., 176 F.2d 101; Himmelfarb v. United States, 9 Cir., 175 F.2d 924, certiorari denied 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527; United States v. Krulewitch, 2 Cir., 167 F.2d 943, reversed on other grounds in 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790; United States v. Williams, 2 Cir., 146 F.2d 651, certiorari denied 324 U.S. 876, 65 S.Ct. 1016, 89 L.Ed. 1428. The error must be such as would result in manifest miscarriage of justice or affect seriously the fairness of judicial proceedings. Smith v. United States, 9 Cir., 173 F.2d 181. See also Benson v. United States. 5 Cir., 112 F.2d 422, certiorari denied 311 U.S. 644, 61 S.Ct. 43, 85 L.Ed. 411. Thus, in United States v. Bazzell, 7 Cir., 187 F.2d 878, we refused, in our discretion, to find that plain error had occurred. See also United States v. Sferas, 7 Cir., 210 F.2d 69, certiorari denied, Skally v. United States, 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086; Apodaca v. United States, 10 Cir., 188 F.2d 932. And in United States v. Jones, 7 Cir., 204 F.2d 745, at page 749, certiorari denied 346 U.S. 854, 74 S.Ct. 67, 98 L.Ed. 368 we said, citing United States v. Jonikas, 7 Cir., 187 F.2d 240: "In view of the failure of defendant's counsel to advance the explicit contention here asserted, but 'consciously failed to save the point' in the court below, we can not say that the error was obvious. * * * We shall not, in a flagrant case, give cognizance to a complaint first made to us and thus give defendant two bites at the same cherry, by declaring erroneous action of the trial court, the fault of which defendant did not see fit to make the court aware, when he had the opportunity to do so."

■ Defendant complains chiefly of comments of the District Judge to the jury after the jurors had been sworn, but before they had received any evidence. Evidently the judge had been dissatisfied with an apparent miscarriage of justice in a previous case, where the jury had ignored the evidence and acquitted a defendant who, the judge undoubtedly thought, was guilty. Rather wide publicity had been given the incident by the press. However, it is apparent from reading the comments that, out of a super-abundance of caution, the judge was advising the jury that, though he had criticized the jury in one case widely publicized in the newspapers, he was not in the habit of doing so. Obviously, he was fearful that the newspaper reports might have inspired in the jurors' minds the false idea that he was addicted to the practice of criticizing verdicts. What he said was obviously intended to advise them that he did not ordinarily do so and to assure them that they were free to exercise freely their inherent independent functions as jurors. This is obvious from his concluding remark that, in fairness to all defendants, he "wanted" the jury to know that he had no preconceived ideas. He added: "I make that statement because I want this defendant and * * * the Government both to have a fair trial, and I do not want you to have any idea that I participate in or have any notions or am in the habit of criticizing juries about their decisions."

As we have pointed out, to these comments no objection was made. If there was anything in any part of the comments deemed prejudicial, it was defendant's duty to object and to call to the judge's attention what he deemed erroneous in order that the court might rectify any error made. But the first complaint of these comments is made on appeal. Clearly, we are without right to consider or to determine the error assigned, unless we can say as a matter of law that it constituted manifest error with resulting prejudice to the rights of defendant.

It seems obvious that, despite the good intentions of the judge, it was injudi-

cious on his part to comment upon a prior case. But he was inspired by anxiety to assure defendant of a fair trial. Any apparent inadvertent overstepping of the boundaries of the proprieties in a jury trial in the way of indiscreet remarks, we think was, in view of the complete remarks, wholly without legal significance. We cannot see that the defendant was in any wise prejudiced by what was said. The jury was selected on Jan. 5, 1954. The trial began Jan. 18, and continued intermittently until March 2, 1954. At no time did defendant complain. Considering all the circumstances, we are of the opinion that it is beyond our province to declare that prejudicial error intervened.

In this connection we observe that defendant tendered instructions fully defining the functions of the jury as the exclusive triers of the facts, which were given by the court. One was, in pertinent part, as follows: "You are instructed that the jury is the sole judge of the facts in this case * * *. And in anything that the court may say in these instructions, the court has not intended, and he does not now intend to express any opinion upon the facts of this case, on the credibility of the witnesses, or the weight to be given their testimony." The court also approved and gave defendant's instruction number 11 which it characterized, in colloquy with counsel, as telling the jury "it is their duty to find the defendant not guilty if they possibly can." The effect of these and other similar instructions was to advise the jury fully and completely of their duty to ignore the court's remarks in the course of the trial, except those as to the controlling law, and to point out clearly their exclusive function of determining where the truth lay. Having failed to object to remarks at the time they were made, defendant might, if he felt himself prejudiced, have eliminated that prejudice by asking the judge to give an express exclusionary instruction, and in case of his failure to do so, have preserved the point he now attempts to raise.

It is urged that the court erred in instructing the jury as to the essential element of guilty knowledge of the falsity of the representations made. It exhaustively instructed the jury as to the essentials of proof and the law governing the indictment and the trial. In the course of his charge, however, the judge used these words: "It is not necessary, however, for you to find that the defendant had actual knowledge of the falsity of the representations being made. That part may be inferred from the evidence." The court had fully explained that before the defendant could be found guilty it was necessary to find, beyond all reasonable doubt, that he had knowledge of the falsity of the representations made. But, as the judge said, guilty knowledge may be inferred where its asserted lack consists of ignorance of facts which ordinary persons under similar circumstances should have known, and the defendant could not be found guilty unless the jury found from the evidence that he must have known of the falsity. Proof of knowledge of falsity of what is said is seldom susceptible of proof by direct testimony. We cannot reach into a man's mind and pick out any tangible, physical evidence of what has transpired in his mental processes. Of necessity, recourse to proved circumstances alone must supply the answer. Consequently, the jury, considering the circumstances, was called upon to determine whether it appeared, beyond all reasonable doubt, that defendant knew or was bound to know that what he said and did was done knowingly. Such was the full import and impact of the court's complete charge. Obviously, it was endeavoring to advise the jury that before defendant could be found guilty, the circumstances proved must justify, beyond all reasonable doubt, only an inference that the defendant knew of the untruth of what he said or wrote. Bentel v. United States 2 Cir., 13 F.2d 327. Of course, guilty knowledge must be proved beyond all reasonable doubt, as the court charged, but proof of actual existence of such knowledge is not required;

scienter may always be inferred from the proved circumstances, where its asserted lack is based on ignorance of evidentiary facts which any ordinary person under similar circumstances would be bound to know. Stone v. United States, 6 Cir., 113 F.2d 70; Schwinn v. United States, 9 Cir., 112 F.2d 74, affirmed per curiam 311 U.S. 616, 61 S.Ct. 70, 85 L.Ed. 390; United States v. Sylvanus, 7 Cir., 192 F.2d 96, certiorari denied 342 U.S. 943, 72 S.Ct. 555, 96 L.Ed. 701. It being apparent that the court correctly instructed the jury in this respect, it cannot be said that plain error intervened or even that, had there been an objection, it would have raised any meritorious ground for review here. Obviously, if defendant thought the instructions were not clear, he had a right and duty to object at the time they were given in the manner provided by the rule in order that the court might have full opportunity to amend the charge if it saw fit to do so.

■ Defendant asserts error because a Government witness, a lawyer, was permitted on re-direct examination, to testify that, in his opinion, the securities involved came within the Securities Act. Section 77b of that Act defining securities, includes among other things, "fractional undivided interest in oil, gas, or other mineral rights". The instruments involved were strictly within this limited category; indeed they were of the exact character defined in the quoted words. The court, in essence, instructed the jury as a matter of law that the undivided interests in oil, gas and other mineral rights which defendant was charged with having sold were within the statute. Consequently, the proof of which complaint is made, was wholly superfluous and, if objection had been made, the answer could and probably would have been excluded. But there was no error, for the reason that the witness merely testified to what the court instructed the jury was true as a matter of law. That the securities were within the statute, cannot be questioned. Not only, therefore, was there failure to object,

but there was complete absence of plain error which would justify us in invoking Rule 52(b).

We have before us a case where the evidence of guilt was voluminous and convincing. Indeed defendant does not question the sufficiency of the evidence, or its overwhelming character. But, though he has desisted from raising objections to testimony of which he now complains, though he complains of the court's comments to which he has preserved no objection, and though he attacks the court's instructions, all of which could have been corrected if the court's attention had been called to any possible error, at the proper time and place, he now insists that, despite his apparent original thought that none of these matters of which he complains was erroneous, they were plain prejudicial errors. We cannot subscribe to this conclusion.

Defendant asserts broadly that he was deprived of a fair trial, yet nothing in the record supports the premise. True his original counsel had an attack of laryngitis, but the court, with sympathetic appreciation of the situation, continued the cause for defendant's opening statement and later advised the jurors, on January 26, that associate counsel had been brought in and would participate in the trial as counsel. So, after Jan. 26, until the trial was concluded on March 3, two attorneys appeared for and represented defendant, both of whom, so far as this record discloses, were competent and able. Certainly the record reflects no basis whatever for defendant's assertions in this respect.

■ Nor was the judgment defective. Though cumbrously phrased, it is clear that defendant was sentenced to 5 years in the custody of the Attorney-General upon certain named counts, and placed on probation, at the expiration of that sentence, for 5 years on certain other named counts. The sentence conformed to the requirements of Title 18, Sec. 3651, U.S.C. See Weber v. Squier, 9 Cir., 124 F.2d 618, certiorari denied 315 U.S. 810, 62 S.Ct. 800, 86 L.Ed. 1209; Palmer

v. Sanford, D.C., 57 F.Supp. 104, affirmed 5 Cir., 147 F.2d 549, certiorari denied 325 U.S. 878, 65 S.Ct. 1555, 89 L.Ed. 1995.

The judgment is

Affirmed.

FINNEGAN, Circuit Judge (dissenting).

Immediately preceding the government's opening to the jury, sworn and waiting to try defendant on an indictment charging violations of 18 U.S.C. § 1341 and 15 U.S.C.A. § 77q(a), the District Judge addressed those jurors as follows:

"The Court: Now, Ladies and Gentlemen, we will have the opening statement by the Government. It just happens that counsel for the defendant has a severe condition of laryngitis, and I will not impose upon him to give his opening statement this afternoon. We will then adjourn until one o'clock Monday when we will resume and have his statement and proceed with the case, putting on evidence.

"I apologize for the delay today, but since you were here I tried a number of cases; one of them we just finished today, involving a complicated matter. It just happened it ran over and I couldn't help it.

"I think in fairness to this defendant I should say something to you Ladies and Gentlemen before this case starts. I do not want you people to get the impression that I as a judge have any notion about what you should do as members of the jury, and I am going to try to give this defendant a fair trial and give the Government a fair trial.

"I have been practicing law and been a judge altogether over a period of upwards of twenty-seven years; about twenty-five of that was as a lawyer. I have disagreed with a few juries, and not too much. I never criticized but one jury in my life, as a practicing lawyer or as a judge. Most of the decisions that I have seen since I have been a judge were just about the same as I would have rendered. I did criticize one, and some of you may know about it, and I do not regret that I did. If I had it to do over I would again, because in that particular case we had a man who sat here on the witness stand who was charged with robbery and admitted when he took the stand —he did not have to take the stand, but he took the stand and admitted himself that he had been convicted of larceny, and then he admitted that he had pleaded guilty to robbery before, and the jury saw four deputies necessary, sitting around him during the whole time.

"When the evidence began to get pretty conclusive about the man at the bank who went to the back door and looked out and saw a car bearing license that was the same number as was on this man's car, the same description of the car, and a man who resembled this man, was blond and gave a description, but too far away to identify him—when it began to get too warm he talked to his attorney and the attorney gets up and says: 'Now, we'll admit that the car in which the robbery was done belonged to us, that it belonged to my client, that he had it in his possession immediately before the robbery, about thirty minutes, and that he had it in his possession immediately after the robbery. The only thing of it is my client went over to get a haircut while it happened.'

"And then the testimony further showed that he left a place way up on the north side at three-thirty, on Bosworth Avenue, 1300 something, he took his sister-in-law to his mother's—mind you, leaving at three-thirty—took his sister-in-law to her mother's at her address; then he took his sister-in-law's brother-in-law to this place where the haircut was to take place; then he took the car over to another place, turned it

over to one of the two fellows who had testified that they were with him and held up the bank and used the guns, and that the car and the guns were furnished by him, and who were not in any way impeached —two much younger fellows—all of that—and the robbery was done and completed and the police were there at five minutes after four, in a period of thirty-five minutes that he accomplished all of those many things.

"It sounded to me like you would have had to have Aladdin's magic carpet to have moved around over the city of Chicago, because that was out on Harrison Street, around Harrison Street and Crawford, and then still the car had to get over to Cicero where the robbery occurred. It was so impossible and improbable.

"But I think in fairness to any defendant that I want you to know that I haven't got any preconceived notions. But in a case like that, a man that confesses that he was guilty of robbery but he just didn't do this one, and with such a flimsy excuse.

"I make that statement because I want this defendant and I want the Government both to have a fair trial, and I do not want you to have any idea that I participate in or have any notions or am in the habit of criticizing juries about their decisions.

"Counsel for the Government will proceed."

Because these remarks created an unfit intellectual climate for adjudicating guilt or innocence I would reverse defendant's conviction and judgment entered thereon. That pre-trial summation of judicial reaction to a previous jury's verdict carries clear intimation and forebodings of potential criticism awaiting any jury whose decision failed to square with views harbored by the presiding judge. His remarks infected the trial environment by engendering fear in the jurors' minds, of criticism. Once these are implanted it is psychologically futile to attempt eradication by instructions or, even

worse, for a reviewing tribunal to recline on the nearest convenient assumption that fundamental rights flourished unimpaired. Intimidation by fear of noncompliance and consequent loss of judicial approbation impaired impartiality.

If I accepted the government's gloss it would simply mean turning my back on practicality and reality while gliding to an affirmance on the notion that those prefatory words were either dissipated by lapse of time or merely constituted an admonition concerning jury duty. Indeed, the impact of the District Judge's words are stressed in this fashion by the government, in its brief:

"Whereupon the trial court, exercising a general duty to interest himself in the fair and impartial administration of justice, *saw fit to comment in no uncertain terms* on the whimsical, capricious or possibly the corrupt verdict of the jury. Who can deny the responsibility of the trial court in such a matter?" (Italics supplied.)

Responsibility for fair and impartial administration of justice rests upon the trial judge, but this is hardly accomplished by charging the atmosphere of a trial with "comments in no uncertain terms" about past verdicts. I think it time some breadth of vision be achieved in criminal cases.

Any cutting edge, seemingly possessed by Lehman v. District of Columbia, 1902, 19 App.D.C. 217, cited to us by the government as dispositive of the problem, is quickly dulled on close reading of that case. There a district judge received a verdict from jury A in the presence of jury B—then trying issues involving Lehman. That district judge directed some brief (Id., 227) and blunt remarks to the foreman of jury A, and, no doubt Lehman's jurors overheard. At bar, the trial judge addressed only the Vasen jury, his captive audience. Furthermore, the Lehman judge specifically covered the episode by charging jury B (Lehman's jurors) *inter alia* (Id., 228): "I do not want you to take to yourselves

anything I said to them." (referring to jury A). It cannot be logically said in one case jury instructions cure alleged errors and then here say the jury paid scant attention, or construed the quoted passage in non-prejudicial terms. I prefer to err, if indeed I do, on the side of one accused of crime. See e. g. Bollenbach v. United States, 1946, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350; United States v. Levi, 7 Cir., 1949, 177 F.2d 833. Defendants are unclassified when measuring rights accorded them, or to which they are entitled, during criminal trials. Before the bar, a man is neither tax-evader, murderer, nor petty thief prior to conviction by an impartial tribunal. Trite, distasteful and inconvenient as these elementary principles may appear, persons accused of crime remain entitled to a fair and impartial trial.

Mr. Chief Justice Hughes, delivering the majority opinion, in United States v. Wood, 1936, 299 U.S. 123, 145–146, 57 S.Ct. 177, 185, 81 L.Ed. 78 wrote this trenchant observation which well illustrates my point of concern:

> "Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula."

Methodology utilized in selecting, or eliminating prospective jurors from the rolls, is, of course, not the sole criteria of impartiality. It is no idle gesture which finally forbade trial judges from directing, directly or indirectly, verdicts of guilty, or from trenching on the jury's domain.

In these times, turbulent with conflicting and competing ideologies, democracy's best credentials stem from how we *actually* administer justice. Laymen everywhere quickly discern differences between actions and words. Our theory of government and law will quickly rot and wither planted among shallow applications of basic tenets in empty cere-

monies. Long ago tyranny and domination were pruned out of governmental theory leaving us freemen governing ourselves consonant with principles of liberty and individual freedom. No small part of this heritage is the organic law provision for fair and impartial trials. Better several scoundrels escape because we may strike down basically unjust and biased procedures, than one innocent person suffer an unfair forfeit. Fed.Rules Crim.Proc. rule 52(b), 18 U.S.C. *Ad hoc* deviations, for expediency's sake, tend to taint and corrode the entire administration of criminal law. I am well aware that ordering new trials casts a heavy burden upon both sides. Nor have I overlooked problems arising in connection with reassembling witnesses and proof; that both sides are now educated to one another's case. Yet, in my opinion, these factors fail in counterbalancing the need for retrying Vasen's case.