**STATE of Tennessee, Appellee,**

v.

**James T. PATTERSON, Appellant.**

**No. 83-129-III.**

Court of Criminal Appeals of Tennessee, at Nashville.

May 30, 1984.

Permission to Appeal Denied by Supreme Court Aug. 27, 1984.

Jerry L. Smith, Asst. Atty. Gen., Nashville, Joseph D. Baugh, Dist. Atty. Gen., Franklin, for appellee.

Ernest W. Williams, Franklin, for appellant.

## OPINION

DAUGHTREY, Judge.

The dispositive question presented by this appeal is whether the Tennessee statute prohibiting misapplication of contract payments applies to a real estate contract when the payor does not have actual title to the property under construction.

This issue has not been decided previously by the Tennessee courts, and authority in other jurisdictions is split. *Compare and contrast State v. Low*, 18 N.J. 179, 113 A.2d 169, 172 (1955) (crime of misappropriation by a contractor "embraces ... funds received from persons having a contract for the purchase of the property upon which the building is to be constructed"), *with State v. Tabasso Homes*, 42 Del. 110, 28 A.2d 248, 255 (1942) (developer held to be true owner, alleged victims "had merely an agreement to purchase, which might or might not be consummated"). Because of the clear wording of the Tennessee statute and for other reasons set out below, we affirm the defendant's conviction and his suspended sentence of one to five years.

The facts of this case are largely undisputed. In September 1979, defendant James T. Patterson and Thomas and Bettye Dickens signed a real estate contract in which the Dickenses agreed to buy a condominium known as Unit 35 in the Deercrest Subdivision adjacent to the Temple Hills Country Club in Williamson County, Tennessee. Unit 35 was one of eight units then under construction, all of them covered by a single construction loan Patterson had negotiated with Fidelity Federal, a Nashville lending institution. At the time the contract was signed, only the foundation for Unit 35 had been laid, and the purchase price initially was left open because the Dickenses requested certain changes in the building plans. The contract was made contingent on the sale of the Dickenses' Nashville home and on their approval of final specifications.

In January 1980, the defendant agreed to the Dickenses' request for the addition of a Jacuzzi and a bar; the cost was added to the purchase price. The Dickenses also were allowed to choose the paint, brick, cabinets and hinges for the condominium. During the same month, Thomas Dickens gave the defendant a check made payable to Patterson and Associates Realtors for $2500 in earnest money; it was deposited in the defendant's personal savings account at a Nashville bank where Patterson was then overdrawn in the amount of $248.37.

The Dickenses' Nashville home was sold in February 1980, and on March 14 they signed a move-in agreement on Unit 35. Pursuant to that agreement with Patterson, the Dickenses took possession of the condominium (which was 80–90% complete) and paid insurance on the premises, plus $229.17/month rent to cover the interest on defendant's construction loan until the closing. The parties further agreed not to close on the deal until interest rates declined. That same day Thomas Dickens executed a check for $59,882 (still labeled "earnest money"). Three days later this check was credited to the account of Patterson and Associates at a bank in Franklin where the balance in the account prior to the deposit was $17.49. At the same time, a check for $7000, signed by the defendant, was debited from this account and deposited in the defendant's personal checking account in Nashville. Prior to the $7000 deposit, that account was once again overdrawn, this time by $310.94. The defendant apparently used most of the rest of the $59,882 received from Thomas Dickens to pay bills due on all eight units at Temple Hills.

In September 1980, the defendant told the Dickenses about some "Fannie Mae" money available from Fidelity Federal, and Thomas Dickens decided it was time to close. He was not able to get that 12% loan, however, so they reset the closing date for November.

In October, the Dickenses' attorney did a title search and discovered liens against Unit 35. Moreover, the defendant was not able to get Unit 35 released from the construction loan on the eight units at Temple Hills in time for the November closing. The parties set a new closing date—December 12, 1980. On that day, a Friday, the defendant gave the Dickenses a warranty

deed and promised to obtain a release on the property by the following Monday. Thomas Dickens executed a check for $27,000, the balance of what he owed on Unit 35. Patterson agreed not to cash the check until he obtained the release. When no release was forthcoming, Thomas Dickens stopped payment on the check.

In May 1981, when Thomas Dickens threatened to go to the district attorney, the defendant offered Dickens quit claim deeds on Units 10 and 11 at the Deercrest Subdivision and further promised to make the back payments on the mortgages on those units. After consulting with his attorney, Thomas Dickens accepted the deeds. Unfortunately, and perhaps predictably, the defendant's check for the late payments on those mortgages was returned for insufficient funds.

Patterson was convicted under the provisions of T.C.A. §§ 66–11–138, governing misapplication of contract payments:

> Any contractor, subcontractor, or other person who, with intent to defraud, shall use the proceeds of any payment made to him on account of improving certain real property for any other purpose than to pay for labor performed on, or materials furnished by his order for, this specific improvement, while any amount for which he may be or become liable for such labor or materials remains unpaid, shall be guilty of a felony and punished accordingly.

This provision has been construed infrequently by Tennessee courts. In one early case cited by the defendant, *State v. Overton*, 193 Tenn. 171, 245 S.W.2d 188, 190 (1951), the Tennessee Supreme Court said that "the gist of the offense" of misappropriation of contract payments is:

> ... that a person exercising a contractual relation shall obtain funds for a specific purpose and shall divert those funds to his own use, leaving outstanding obligations for which the creditor would have a lien upon the property owned by the payor of such funds.... This very closely approaches embezzlement in that there exists the confidential relation and the person who is charged by reason of

such relationship misappropriates or diverts the funds paid to him for a specific purpose and uses them for his own ends.

In a 1965 case, the court made a similar analysis, explaining that the legislative purpose of the statute is "to punish for a fraudulent conversion, and not for failure to comply with a contractual obligation." *Daugherty v. State*, 216 Tenn. 666, 393 S.W.2d 739, 741 (1965), *appeal dismissed* 384 U.S. 435, 86 S.Ct. 1601, 16 L.Ed.2d 671 (1966). The court in *Daugherty* further noted:

> The essential elements for the commission of the offense are the payment of the money to a contractor by the owner for the construction of a building and a diversion of the money to other purposes by the contractor prior to the payment of all claims for which the money constitutes a trust fund.

*Id.* (citations omitted).

█ Pointing to the language of *Overton* and *Daugherty*, the defendant insists that he cannot be found guilty of violating § 66–11–138 because the payments in this case were for the sale of realty and were not made to a contractor by the *owner* of Unit 35 for improvements. He argues that the Dickenses were not owners contracting to "improv[e] certain real property" in the words of the statute, but were only would-be purchasers with a contingent contract.

The trial court was unimpressed with the defendant's contention that he was not criminally liable because the contract payments were for the *sale* of realty, rather than improvements to a piece of real property. The trial judge's characterization of the contract as a construction contract is an apt one, we believe, because the Dickenses' condominium had not been built when the document was signed. In addition, as the state points out, some work was done on the structure in accordance with special changes requested by the Dickenses, which deviated from the standard plans for Unit 35. These clearly qualified as "improvements to real property."

There remains the question of ownership. Although the classic misapplication of contract payments undoubtedly occurs when

the owner of real property pays money to a contractor for improvement of the payor's property, the language of § 66–11–138 does not restrict application of the statute to owner-payors. Moreover, in *State v. Overton, supra,* 245 S.W.2d at 191, our Supreme Court noted that

> ... there are hardly enough precautions that can be taken by the *lender of money or the property owner* to protect himself against improper application of funds paid in certain instances to certain unscrupulous contractors or those doing business on a shoe string. It was probably *by reason of this fact* that the present statute was adopted by the legislature ... (emphasis added).

Thus, the *Overton* court foresaw that others than the owner of a piece of property might be harmed by the misapplication of funds, pointing specifically to the possible victimization of the lender. In this case, the lending institution was not hurt because officials kept a close watch on the progress of construction at Temple Hills, doling out money under the construction contract in direct proportion to the percentage of work completed on the project. At one point, when it appeared that there would not be sufficient funds to complete the eight unit phase of the development that included Unit 35, Fidelity Federal took special steps to protect its interest in the project.

■ Thomas and Bettye Dickens obviously were more trusting and less knowledgeable about how to protect themselves. As a result, they paid Patterson some $72,500 on Unit 35, only to find out that it would require another $83,000 to obtain a release from Fidelity Federal, on a condominium originally priced at $83,500.* There were also several outstanding mechanics and materialmen's liens on the unit. At this point, the Dickenses had not only paid a considerable amount of money for their home (some three-quarters of the original purchase price), but also had assumed liability for it under the contract and had been living in the unit since March

1980. Hence, even if they were not the owners of the property in a technical sense, they were certainly owners in an equitable sense. *See generally Campbell v. Miller,* 562 S.W.2d 827, 831–32 (Tenn.App.1977), a civil contract dispute case, in which the court noted:

> [T]he general rule is ... that a contract for the sale of land operates as an equitable conversion ... and in equity the vendee is regarded as the owner, subject to liability for the unpaid price, and the vendor is regarded as holding only the legal title in trust for the vendee from the time a valid contract for the purchase of land is entered into.

Thus, even if the statute included a requirement that the payor in a misapplication case be the owner of the property in question which it does not, we believe the requirement would be met in this case.

■ Beyond the legal questions now resolved, the defendant's main contention at trial was that he had no intent to defraud the Dickenses. He testified that he could have closed in March 1980 when he received the $59,882 from the Dickenses and said he would have been $23,500 better off if he had closed at that time. He argues on appeal that his tip to Thomas Dickens about the possible availability of loan funds in September 1980 is another indication of his lack of specific intent.

The state responds, on the other hand, that under T.C.A. § 66–11–140, the "use of the proceeds mentioned in [§ 66–11–138] for any purpose other than the payment of such unpaid amount shall be prima facie evidence of intent to defraud." Thus, the prosecution met its burden by introducing undisputed evidence that the defendant used the money for purposes other than paying construction costs on Unit 35. Whether the defendant's disavowal of intent was sufficient to overcome the state's proof was a question of fact for the jury, and it was resolved in the state's favor. *See Stone v. United States,* 113 F.2d 70,

---

* It appears from the record that Patterson's indebtedness to the Dickenses finally was satisfied

some five months after trial.

74–75 (6th Cir.1940); *Webster v. State*, 544 S.W.2d 922, 924 (Tenn.Crim.App.1976). We have no authority to reverse the defendant's conviction on this basis.

For the foregoing reasons, the judgment of the trial court is affirmed.

BYERS, J., and JOHN D. TEMPLETON, Special Judge, concur.