23CA0962 Peo v Thiam 03-12-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0962
City and County of Denver District Court No. 21CR6328
Honorable Ericka F.H. Englert, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Abou Thiam,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE BROWN
Schutz and Berger*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 12, 2026

---

Philip J. Weiser, Attorney General, Patrick A. Withers, Assistant Solicitor
General and Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-
Appellee

Megan A. Ring, Colorado State Public Defender, Daniel J. Sequeira, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1 Defendant, Abou Thiam, appeals the judgment of conviction entered on a jury verdict finding him guilty of attempt to influence a public servant and forgery. We affirm.

## I. Background

¶ 2 In April 2023, Thiam was on probation for unrelated offenses. As a condition of his probation, Thiam was required to either maintain or pursue employment. To prove his employment status, Thiam emailed his probation officer copies of fraudulent paystubs and gave the probation officer a fraudulent check purporting to reflect wages Thiam had been paid. For this conduct, the prosecution charged Thiam with one count of attempt to influence a public servant and two counts of forgery. A jury convicted Thiam as charged, and the district court sentenced him to three years in community corrections.

## II. Analysis

¶ 3 Thiam contends that the district court violated his constitutional right to a fair and impartial jury by denying certain for-cause challenges to biased prospective jurors and by allowing biased jurors to serve on his jury. We discern no error.

## A. Generally Applicable Law and Standard of Review

¶ 4   Criminal defendants have a constitutional right to trial by an impartial jury. U.S. Const. amends. VI, XIV; Colo. Const. art. II, § 16. "A defendant's right to an impartial jury is violated if the trial court fails to remove a juror biased against the defendant." *Morrison v. People*, 19 P.3d 668, 672 (Colo. 2000).

¶ 5   "Procedures for preventing biased jurors from serving are critical to the protection of the defendant's right to an impartial jury." *Clark v. People*, 2024 CO 55, ¶ 2. To that end, section 16-10-103, C.R.S. 2025, identifies several grounds for which parties may challenge for cause biased potential jurors. *Mulberger v. People*, 2016 CO 10, ¶ 9; *see* Crim. P. 24(b). Of course, a party may challenge a potential juror for cause based on their actual bias. § 16-10-103(1)(j) ("The court [must] sustain a challenge for cause" based on "[t]he existence of a state of mind in the juror evincing enmity or bias toward the defendant or the state."); *see also People v. Lefebre*, 5 P.3d 295, 300 (Colo. 2000) (Actual bias "is a state of mind that prevents a juror from deciding the case impartially" and arises from the juror's beliefs. (citation omitted)), *overruled on other grounds by*, *People v. Novotny*, 2014 CO 18, ¶ 27. But "[i]f the trial

2

court determines that a potential juror falls within one of the statutory grounds for causal challenges," their bias is "implied by law," and the court must also sustain a challenge for cause on that basis. *Mulberger*, ¶ 9; *see also Lefebre*, 5 P.3d at 300 ("Implied bias arises out of external factors," such as a relationship between the juror and a participant in the trial.).[1] The party raising the challenge bears the burden of demonstrating a potential juror's disqualification under the statute. *Mulberger*, ¶ 9.

¶ 6 In addition to raising challenges for cause, parties may also exercise a certain number of peremptory challenges, "which allow 'both the prosecution and the defense to secure a more fair and impartial jury by enabling them to remove jurors whom they perceive as biased.'" *People v. Abu-Nantambu-El*, 2019 CO 106, ¶ 18 (quoting *Vigil v. People*, 2019 CO 105, ¶ 19); *see* § 16-10-104(1)(a), C.R.S. 2025; Crim. P. 24(d). "Within

---

[1] In this context, "implied bias" is distinct from the concept of "implicit bias." Implied bias is bias "attributable in law to a prospective juror regardless of actual partiality." *People v. Rhodus*, 870 P.2d 470, 473 (Colo. 1994) (quoting *United States v. Wood*, 299 U.S. 123, 134 (1936)). Implicit bias, on the other hand, is "a bias or prejudice that is present but not consciously held or recognized." Merriam-Webster Dictionary, https://perma.cc/A7Z6-HPLJ.

constitutional limits, a party may use a peremptory challenge to remove a prospective juror without specifying a reason or for no reason at all." *Abu-Nantambu-El*, ¶ 19 (footnote omitted).

¶ 7 We review a trial court's ruling on a challenge for cause to a prospective juror for an abuse of discretion. *People v. Oliver*, 2020 COA 97, ¶ 7. This standard recognizes "the trial court's unique role and perspective in evaluating the demeanor and body language of prospective jurors" and gives "deference to the trial court's assessment of the credibility of [their] responses." *People v. Clemens*, 2017 CO 89, ¶ 13. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or it misapplies the law. *Oliver*, ¶ 7. To the extent that our review of a for-cause challenge requires us to interpret the relevant statute, we do so de novo. *People v. Fransua*, 2016 COA 79, ¶ 18, *aff'd*, 2019 CO 96. When reviewing a challenge for cause, we consider the entire voir dire of the prospective juror. *Oliver*, ¶ 7.

¶ 8 Because an impartial jury is essential to protecting a defendant's right to a fair trial, any error by the court that results in the seating of a biased juror is structural and requires automatic reversal. *Clark*, ¶ 35. But if "a defendant is compelled to use a

4

peremptory challenge to correct a trial court's erroneous failure to dismiss a juror for cause, so long as the defendant receives . . . an impartial jury . . . , the defendant's constitutional rights remain unaffected," and the error does not require reversal. *Abu-Nantambu-El*, ¶ 20; *see Vigil*, ¶ 15 ("[T]he defendant's right to an impartial jury can be adversely affected by an erroneous denial of his challenge for cause only if that juror is not otherwise removed, as by a different challenge for cause or a challenge exercised peremptorily."); *Clark*, ¶ 43 (a trial court's erroneous denial of a challenge for cause was harmless when the defendant used the allotted number of peremptory challenges, the challenged juror did not serve on the jury, and no other biased juror served).

### B.    Bias Implied by Law

¶ 9    Thiam contends that the district court abused its discretion by denying his for-cause challenge to Juror B.L.  He argues that B.L.'s bias was implied by law because he was a compensated employee of the Denver Sheriff Department.  We disagree.

#### 1.    Compensated Employee of a Public Law Enforcement Agency

¶ 10    A prospective juror is presumed to be biased under the law if they maintain a relationship with certain individuals that have the

potential to influence their decision-making at trial. *Abu-Nantambu-El*, ¶ 17. As relevant here, bias is presumed when "[t]he juror is a compensated employee of a public law enforcement agency or a public defender's office." § 16-10-103(1)(k).

¶ 11 To be a "compensated employee" of a public law enforcement agency for the purposes of section 16-10-103(1)(k), the prospective juror must (1) work for a relevant public law enforcement agency; (2) receive payment from the agency in consideration for that work; and (3) work under the agency's direction and control. *Mulberger*, ¶ 15. "The statute's plain language makes no indication that it intends to cover any contractual or other relationships beyond [a] traditional and direct employment relationship." *Id.* at ¶ 16.

2. The District Court Did Not Abuse Its Discretion by Denying Thiam's For-Cause Challenge to B.L.

¶ 12 During voir dire, the district court asked prospective jurors to raise their hands if they worked for a public law enforcement agency or public defender's office. B.L. raised his hand and stated that he was "currently an internal medicine [physician's assistant (PA)] at the Denver jail across the street." In response to the court's inquiry, B.L. clarified that he was "a third-party hire through the

6

[Denver Sheriff Department]" but worked "directly" for Denver Health, was not Peace Officer Standards and Training (POST) certified, did not have the power to make arrests, and did not investigate crimes. Defense counsel moved to strike B.L. on the basis that he was "a paid member of law enforcement." The court denied the challenge, reasoning that B.L. is "an internal medicine PA at the Denver jail, he stated he's not POST certified, does not have arrest power[,] and his employer is Denver Health[,] so I'm going to find he's not a paid employee of law enforcement."

¶ 13 Defense counsel later asked B.L. if he worked at any other Denver Health clinics outside of the jail, and B.L. responded that he was "technically . . . contracted through the [s]heriff's department" and that the jail was the only location at which he provided care. Counsel then asked who supervised B.L.'s work, and B.L. identified his supervisor as the medical director at Denver Health. He explained, "[The medical director] has a supervising position for the overarching sheriff's organization. That's technically a physician for Denver Health. He's a contractor."

¶ 14 When asked who directed his day-to-day activities, B.L. explained, "We are pretty autonomous. I pretty much practice and

7

see my own patients." Counsel then asked whether the deputies "ever t[old] [B.L.], you know, go in this room and see this inmate for that bed and stuff like that?" B.L. answered, "Yeah, normally we have kites which are inmate requests to be medically seen, but sometimes at night when emergencies happen, I have to check them out and make sure they're stable. If not, send them to the hospital." Counsel asked whether such actions would be at the direction of the deputies, and B.L. responded, "Yes. Or we see things that maybe the patient is critically ill or needs more observation." Counsel asked B.L. if it would be "awkward" if he served on the jury and voted to acquit and had "to go to work with the sheriffs the next day," and B.L. said, "No, no, no, because the sheriffs are not the ones that are making the charges."

¶ 15 Defense counsel again moved to strike B.L., explaining, "[I]t sounds like the sheriffs have some supervisory power over him." The court denied the challenge. It acknowledged that B.L. "d[id] get some direction from the sheriffs and indications on who might need medical attention" but explained that B.L.'s job was "working for patients, not working for or against law enforcement." B.L. sat on Thiam's jury.

¶ 16    Considering B.L.'s statements during voir dire, we conclude that the district court did not abuse its discretion by determining that he was not a "compensated employee of a public law enforcement agency" for the purposes of section 16-10-103(1)(k). The record does not contain any evidence that B.L. was directly employed or compensated by the Denver Sheriff Department. On the contrary, B.L. stated that he was directly employed by Denver Health and practiced at the jail only on a contractual basis. *See Mulberger*, ¶ 16 ("While . . . private contractors . . . may provide services to public law enforcement agencies, their lack of direct compensation or direction from the public law enforcement agency places them outside of the statute's scope . . . ."). And although B.L. conceded that the deputies often informed him when specific patients required care, he clarified that his work was "pretty autonomous" and that he was supervised by the medical director of Denver Health. At most, the record is unclear as to whether B.L. worked under the Denver Sheriff Department's "direction and control." *Id.* at ¶ 15. Even so, the other statutory requirements to presume this category of bias are not satisfied.

¶ 17    Thus, Thiam did not meet his burden to prove that B.L. was biased, and we perceive no error in the district court's conclusion that section 16-10-103(1)(k) did not preclude B.L. from serving on Thiam's jury.  *See Mulberger,* ¶¶ 9, 15.

## C.    Actual Bias

¶ 18    Thiam contends that the district court abused its discretion by denying his for-cause challenges to prospective jurors that evinced actual bias against him.  Specifically, Thiam argues that Jurors D.H. and M.M. expressed bias against him due to his prior offenses and that prospective Juror K.S. expressed bias against him based on his race and gender.  We perceive no error.

### 1.    Applicable Law

¶ 19    A trial court must sustain a challenge for cause to a prospective juror who has "a state of mind . . . evincing enmity or bias toward the defendant," unless the court is "satisfied, from the examination of the juror or from other evidence, that [the juror] will render an impartial verdict according to the law and the evidence submitted to the jury at the trial."  § 16-10-103(1)(j); *see Vigil,* ¶ 24; *see also Lefebre,* 5 P.3d at 301 ("A potential juror who exhibits

actual bias is not, unlike a juror whose bias is implied as a matter of law, automatically disqualified from serving.").

¶ 20     Notably, "[a] prospective juror's indication that [they have] a preconceived belief as to some aspect of the case does not . . . mandate exclusion of that juror for cause." *People v. Gulyas*, 2022 COA 34, ¶ 19. Instead, if after further examination, the "court is satisfied that a challenged juror will render a fair and impartial verdict according to the law and the evidence presented at trial, then the court should not dismiss that juror for cause." *Clemens*, ¶ 15; *see People v. Merrow*, 181 P.3d 319, 321 (Colo. App. 2007) (When a "potential juror's statements compel the inference that [they] cannot decide crucial issues fairly, a challenge for cause must be granted in the absence of rehabilitative questioning or other counter-balancing information.").

### 2.     Juror D.H.

¶ 21     Thiam contends that the district court abused its discretion by denying his for-cause challenge to Juror D.H. because D.H.'s statements during voir dire evinced bias against Thiam because Thiam was on probation when he committed the charged conduct. We disagree.

11

### a.     Additional Background

¶ 22     During voir dire, defense counsel explained that Thiam was on probation at the time of the charged offense and asked the venire, "Is there anybody who would hold it against somebody that they were accused of a crime while already on probation?" One prospective juror expressed a sentiment common among several others, indicating they would "try [their] best" to put the prior offenses out of their mind and "listen to the evidence and follow the law" but expressing concerns about how their knowledge of the defendant's probation status "would still put a bias" in their minds.

¶ 23     Defense counsel then asked D.H. how he felt about the other juror's response, and he stated, "I agree.  I can go back to agree that there's the presumption of innocence, but there also would be bias." Defense counsel clarified, "So for you — you understand [the] presumption of innocence, but it would be hard to put the bias out of your head?" D.H. responded, "Hard, not impossible. . . .  I mean, if you give me an order and say don't consider that, sure." Defense counsel concluded, "But you would always have it in the back of your mind that somebody might have been convicted of a previous crime?" and D.H. answered, "Yeah."

¶ 24    Following defense counsel's questions, the district court asked the venire members to raise their hands if they felt "that [they] might not be able to be fair and impartial towards the prosecution, the defendant, the attorneys[,] and any of the witnesses." The court observed that none of the venire members raised their hand. The court also asked if anyone felt they "might not be able to follow the law for any reason." The court addressed two jurors who raised their hands, but D.H. was not one of them. The court then individually addressed the prospective jurors who had expressed concerns regarding the presumption of innocence. The court specifically asked D.H. if he would "be able to follow the law," and D.H. responded, "Yes, ma'am."

¶ 25    Defense counsel moved to strike D.H. because he expressed difficulty putting aside his knowledge of Thiam's probation status and "had trouble with the presumption of innocence." The court denied the challenge for cause. The court recalled that D.H. "did say it would be hard but not impossible" to disregard Thiam's prior conviction when evaluating the evidence, but it reasoned that, when asked directly, D.H. stated that he could follow the law. The court also noted that D.H. did not raise his hand when the court asked if

13

anyone thought they might be unable to be fair and impartial or follow the law. D.H. sat on Thiam's jury.

### b. The District Court Did Not Abuse Its Discretion by Concluding that D.H. Would Be a Fair and Impartial Juror

¶ 26 Thiam argues that D.H. "clearly expressed bias and sincerely doubted his ability to be fair" and that the district court's effort to rehabilitate him was insufficient. Further, Thiam argues that D.H.'s silence when the court asked all prospective jurors if they were unable to be fair and impartial merely indicated his reluctance to admit his continuing bias rather than his ability to set aside his bias and follow the law.

¶ 27 True, D.H. expressed hesitation about affording Thiam the presumption of innocence, knowing Thiam was on probation. But his statements were equivocal. He said it would be "[h]ard, not impossible," to set aside the identified bias, adding that if the court ordered him to not consider the prior convictions, he could do so. *See People v. Fleischacker*, 2013 COA 2, ¶ 27 ("It is not necessary that a prospective juror state with absolute certainty that he or she will set aside all potential bias.").

14

¶ 28    After further examination by the court, D.H. explicitly stated that he would be able to follow the law notwithstanding his initial indication that he would have a hard time setting aside Thiam's prior convictions.  *See id.* ("A juror's commitment to try to put [their] biases aside and expression of a belief that [they] can be fair [is] sufficient to deny a defendant's challenge for cause."); *People v. Conyac*, 2014 COA 8M, ¶ 15 ("[A] trial court is entitled to afford considerable weight to a juror's commitment to set aside biases and to be fair."); *Oliver*, ¶ 11 ("In determining whether a potential juror can set aside any preconceived notions and render an impartial verdict, the trial court may consider a juror's assurances that he or she can serve fairly and impartially.").

¶ 29    And when viewed in context, D.H.'s silence in response to the court's general questions concerning partiality and the inability to follow the law corroborated his affirmative statements expressing his ability to be fair and impartial.  *See Clemens*, ¶ 19 ("[A] prospective juror's silence in response to rehabilitative questioning constitutes evidence that the juror has been rehabilitated when the context of that silence indicates that the juror will render an impartial verdict . . . ."); *cf. People v. Marciano*, 2014 COA 92M-2,

15

¶ 16 (a prospective juror's silence in response to questioning did not constitute an affirmative indication of their ability to follow the law because the record from voir dire did not contain any counterbalancing information evincing the juror's ability to be fair and impartial).

¶ 30 The totality of D.H.'s voir dire does not "compel the inference that he [could not] decide crucial issues fairly." *Merrow*, 181 P.3d at 321. Rather, the record supports the district court's conclusion that D.H. could render a fair and impartial verdict. *See Clemens*, ¶ 16 ("The court makes th[e] determination of whether a juror should be removed at the conclusion of voir dire, considering evidence such as the prospective juror's response to the counsels' questioning, the court's own questioning, and the demeanor and body language of the juror in the context of the entire voir dire."). As a result, we conclude that the court did not abuse its discretion by denying Thiam's challenge for cause to D.H. *See id.* at ¶ 25; *People v. Young*, 16 P.3d 821, 825-26 (Colo. 2001) (the trial court did not abuse its discretion in denying the defendant's challenge for cause because the juror had been rehabilitated).

### 3. Juror M.M.

¶ 31    Thiam contends that the district court abused its discretion by denying his for-cause challenge to Juror M.M. because M.M.'s statements during voir dire also evinced bias against Thiam for having prior convictions.  We are not persuaded.

### a. Additional Background

¶ 32    As part of the discussion about having difficulty setting aside a defendant's prior conviction when evaluating the evidence in the case, M.M. volunteered, "We are analytical thinkers so we recognize patterns.  As much as I would try to do what the judge says and have an open mind, I know the way my brain thinks.  I would recognize patterns."  Defense counsel sought clarification, asking M.M. if he meant "[t]hat [it] would be difficult for [him] to put aside [a prior conviction] in jury deliberation?"  M.M. began to respond, "I mean, if it was a similar probation, yeah, hypothetically.  I don't know details — ."  But the prosecutor interrupted M.M.'s answer and requested a bench conference.  Following the bench conference, defense counsel asked the venire, "[H]ow would anybody here feel if they never get to find out the reasons someone was on probation?  Would that be something that you would hold against them?"  The

record does not reflect that M.M. raised his hand or expressed further concern.

¶ 33　　As noted, after defense counsel finished her questioning, the court asked the venire members to raise their hands if they felt as though they could not be fair and impartial or could not follow the law. M.M. apparently did not raise his hand. And the court did not address M.M. individually.

¶ 34　　Later, defense counsel moved to strike M.M. for cause because he was "a very analytical person," "an engineer [who] would see patterns so it would be difficult for him to put aside the fact that somebody had previously been convicted of a crime." The prosecutor argued that M.M. never indicated that he would not follow the law. The court denied Thiam's challenge for cause, explaining that M.M. "was discussing the hypotheticals if he learned that Mr. Thiam was on probation at the time. He said that he recognizes patterns[,] and he said if it were similar, he might have a difficult time, however, I understood [M.M.]'s comment to be more general." The court noted that M.M. did not raise his hand when it asked the venire whether anyone believed that they could not be fair and impartial or follow the law. M.M. sat on Thiam's jury.

### b. The District Court Did Not Abuse Its Discretion by Concluding that M.M. Would Be a Fair and Impartial Juror

¶ 35    Thiam argues that M.M.'s statements reflected that he "would hold the fact of a prior conviction against" Thiam. He also argues that M.M.'s silence in response to the district court's general questions was insufficient to rehabilitate him.

¶ 36    We acknowledge that M.M. expressed hesitation in his ability to afford Thiam the presumption of innocence upon learning of Thiam's prior convictions. But like D.H., M.M. did not unequivocally indicate an inability to set aside that bias. *See Fleischacker*, ¶ 27. Instead, M.M. explained that human beings are "analytical thinkers" and that, while he "would try to do what the judge says and have an open mind," he likely would "recognize patterns." *See People v. Richardson*, 58 P.3d 1039, 1043 (Colo. App. 2002) (finding that a juror's statements that she was "human" and that "there [we]re no guarantees," but she would "give it [her] best shot" supported the trial court's denial of a challenge for cause).

¶ 37    True, when pressed, M.M. stated that, if the defendant was on probation for a similar crime, it would be difficult for him to put that fact aside when deliberating. But he also stated that he "[did

not] know details" of the case and was only speaking "hypothetically." By qualifying his comments in this manner, M.M. revealed his willingness to remain impartial until he heard the relevant evidence. *See People v. Garcia*, 2018 COA 180, ¶ 23 (A juror's statement that he had "never been in this situation before [so he didn't] exactly know" established that he "took the duty to be objective quite seriously."). And when defense counsel asked whether anyone would hold it against Thiam if they never found out why he was on probation, M.M. did not raise his hand.

¶ 38    M.M. also remained silent when the court asked if any venire members felt they could not be fair and impartial or follow the law. Although Thiam argues that this silence reflects M.M.'s reluctance to speak up, the context suggests otherwise. M.M. participated actively in voir dire, offering his views about the prior convictions, as discussed, and voluntarily answering another question concerning relationships to law enforcement. Consequently, the court could have "fairly attributed [his] silence to [his] willingness to follow the law as instructed by the court as opposed to a fear of speaking up." *Clemens*, ¶ 22.

¶ 39    Viewed in the context of the entire voir dire, we conclude that M.M.'s statements did not evince bias against Thiam.  Thus, we perceive no abuse of discretion in the court's determination that M.M. was capable of being a fair and impartial juror and its denial of Thiam's challenge for cause.  *See id.* at ¶ 15; *see also Garcia,* ¶ 21 ("The . . . court was in the best position to evaluate whether [the prospective jurors]'s ambivalence about his objectivity was sufficient to indicate bias.").

### 4.    Prospective Juror K.S.

¶ 40    Thiam contends that the district court abused its discretion by denying his for-cause challenge to prospective Juror K.S. on the basis that her voir dire comments reflected bias against Thiam based on his race and gender.  We are not persuaded.

### a.    Additional Background

¶ 41    During voir dire, the district court asked the venire, "Do any of you feel you might be disqualified from being a juror on this case for any other reason?"  K.S. raised her hand and responded,

> I don't know if this matters at all.  I have been to [W]est Africa three or four times.  My nonprofit work is in that area extensively.  I definitely have developed biases, both pro and con, on cultural issues there and differences

between cultural issues in Sierra Leone. I don't know exactly where he's from. I know I have been in western Africa. I don't know if that makes a difference or not.

¶ 42    The court asked K.S. if she had ever met Thiam or anyone who knows Thiam while traveling in West Africa, and K.S. responded, "No." The court then asked if K.S. was "willing to set aside what you know in [W]est Africa and your experiences there and take the evidence you hear in this trial and apply the law to the facts you decide as a juror?" K.S. responded, "I'll do my best." K.S. apparently did not raise her hand when the court asked the prospective jurors if they felt as though they could not be fair and impartial or could not follow the law.

¶ 43    Defense counsel moved to strike K.S. because her responses evidenced that "she had certain cultural biases[,] which [counsel] basically heard as racisms . . . against people from Africa." The prosecutor argued that K.S. "said there were pros and cons with her biases[,] and she said she would put them aside . . . [and] follow the law." The court noted that it heard K.S. "say on two occasions she w[ould] follow the law and instructions from the court." It denied the challenge for cause.

22

¶ 44     Later, defense counsel asked the court to question K.S. further about her "cultural biases."  Outside the presence of the venire, the court asked K.S. to elaborate:

> K.S.: Culturally there are things that happen there — culturally my line of work that we do, they have a different moral code in a lot of ways.  They will lie to your face if they think that's what you want to hear, but to them that's not an issue.  They don't see that as lying.  So when I put together the idea that he's still using a translator, I don't know whether he's been here — how long he's been here, does he really understand?  That's what starts to get things weird in my mind.  I will do my best to set it aside, but that's kind of where I was coming from.
>
> COURT: What is the work you've done in [W]est Africa?
>
> K.S.: We do micro loans and business training for at-risk women and vulnerable girls.  We work with women a lot whose husbands are typically the bad guy, right?  They abandon the women.  Women don't have a whole lot of rights.  So we work with women to provide micro loans and business training so they can start businesses for themselves and support for their families and their kids.

¶ 45     The prosecutor asked K.S. if she would be able to provide Thiam with the presumption of innocence and hold the prosecution

23

to its burden of proof, notwithstanding her preconceived beliefs.

K.S. said that she could, adding,

> I get morally conflicted then in a particular
> case as to how much did he really understand
> about the law. I would like to be able to stand
> here and say I'd never take that into account,
> but it's very emotional work that we do and it's
> hard, and like we run up against situations
> where the women won't pay their loans back
> because they don't see that they have to. They
> have a different — they don't understand a
> business transaction or they don't understand
> that. We spent a lot of time teaching
> accountability, responsibility and stuff. That's
> part of our curriculum. I believe, yeah, I could
> do my best to do that.

¶ 46    Defense counsel asked whether K.S. meant "that potentially

people from western African countries are maybe less credible."

K.S. responded,

> Not that. I mean, their hearts are in the right
> place. It's just different culturally. That's not
> looked upon as a bad thing. When you're lost
> or something, you ask somebody for
> directions, they will give you directions. It will
> be to something totally different, but they don't
> want to be someone who says — they don't
> want to be the person who says I don't know.
> It's trying to please you. It could be totally not
> relevant in this case, but I do know that some
> of the issues of lying are different. It's looked
> upon differently.

Now, stealing, I mean, you know that's something that I think is universal. They'll borrow from a family member. If a family member gets a loan, one of the micro loans, they are obligated to share. It's just a different way of doing business.

¶ 47 Defense counsel next asked if Thiam "being a man specifically from [W]est Africa . . . would be difficult" for K.S., and K.S. said she did not think so. She reasoned, "I know a lot of really decent men there too, you know. I don't want to overgeneralize anything that way. A lot of women that I work with are not in that situation, but I do know a lot of men who aren't that way."

¶ 48 Elaborating on her concerns with Thiam using an interpreter at trial, K.S. explained, "[I]t makes you wonder how much he understands." She continued, explaining that she was concerned that Thiam did not "have a grasp of the English language." She went on, "I mean, we use translators all the time in our teaching just because we don't want anybody to miss anything."

¶ 49 Then the court addressed K.S., asking whether she understood that if she was selected as a juror, it would be her job to "listen to the evidence . . . and follow the law in this case." K.S. said, "Yes." The court asked K.S. if she understood it was not "part

of [her] job here" to make assumptions about Thiam based on where he came from. K.S. said, "Yes, I do." The court asked K.S. if she could follow the law and be a fair juror in the case, and K.S. responded, "I think I could."

¶ 50     Defense counsel renewed her challenge for cause to K.S., noting that the charges against Thiam involved allegations "related to honesty." The court denied the challenge, explaining that K.S. said "she could follow the law and be a fair juror in this case" and that "she understands what the role is here and that she's not to make assumptions about Mr. Thiam based on other people she knew or may have known of." The court concluded, "[T]he law tells me that I'm to assume the jurors will follow my instructions. I'm going to deny the motion for cause." Defense counsel subsequently used a peremptory challenge to strike K.S. from the jury.

      b.    The District Court Did Not Abuse Its Discretion by Denying Thiam's For-Cause Challenge to K.S.

¶ 51     Thiam argues that the district court abused its discretion by denying his for-cause challenge to K.S. after she made statements evincing racial and gender bias. Specifically, Thiam argues that K.S.'s statements (1) that she "definitely" had developed biases for

26

and against people from West Africa; (2) that people from West Africa will "lie to your face"; and (3) that West African men "abandon the women" show that K.S. was clearly biased against Thiam.

¶ 52     First, we acknowledge that, out of context, several of K.S.'s statements could reasonably be perceived as evincing racial or gender bias — particularly, her statements that West African's have a "different moral code," that they will "lie to your face," and that the men will "abandon" their wives.  But when considered in context, K.S.'s statements suggest that, because of the cultural differences she had experienced, she was concerned that Thiam may not have understood that his charged conduct was illegal.

¶ 53     K.S. stated that she was unsure "how much [Thiam] really [understood] about the law."  And she flatly rejected defense counsel's characterization of her comments as reflecting a belief that "people from western African countries are . . . less credible." Instead, she sought to communicate that people from West African countries may view lying differently than people in western cultures.  K.S.'s comments also show her general concern about Thiam's ability to understand the trial proceedings given his "grasp

27

of the English language." K.S. said that because Thiam was using an interpreter, she was concerned about "how much he understands."

¶ 54 Second, even had K.S.'s statements evinced bias, the court's and counsel's additional questioning provided sufficient counterbalancing information for the court to conclude that K.S. was willing to be a fair and impartial juror. *See Merrow*, 181 P.3d at 321. The court carefully explained that K.S. did not have "to put all [her] life experience in a box" but that, if she were to be selected as a juror, it would be her job to "listen to the evidence in this case and follow the law." K.S. indicated she understood. K.S. also affirmed she understood that it was not her job to "make assumptions about Mr. Thiam and where he comes from." Finally, when the court asked whether K.S. could follow the law and be a fair juror in this case, K.S. agreed she could. *See Clemens*, ¶ 17 ("If, after such explanation, jurors no longer hold tight to their preconceived expectations and instead are willing to apply the law as instructed by the court, then the jurors are rehabilitated.").

¶ 55 Considering K.S.'s entire voir dire, we conclude that her statements generally reflected concern for Thiam's right to a fair

28

trial rather than negative racial and gender biases against men from West Africa. Further, the court's efforts to rehabilitate K.S. were sufficient for it to conclude that K.S. could set aside her beliefs and be a fair and impartial juror. *See Vigil*, ¶ 24; *Fleischacker*, ¶ 27. On this record, we perceive no abuse of discretion. *See Clemens*, ¶ 15.[2]

### III. Disposition

¶ 56    We affirm the judgment of conviction.

JUDGE SCHUTZ and JUDGE BERGER concur.

---

[2] Because we have concluded that the district court did not abuse its discretion by denying Thiam's for-cause challenge to K.S., we need not consider Thiam's arguments that the error is structural even though a biased juror did not serve on his jury. *See Clark v. People*, 2024 CO 55, ¶ 42 ("[W]hen a defendant uses a peremptory challenge to correct a trial court's erroneous denial of a challenge for cause, 'so long as the defendant receives both an impartial jury and the number of peremptory challenges specified by state statute, the defendant's constitutional rights remain unaffected.' Absent bad faith, any such error that does not result in the biased juror actually participating on the jury is necessarily harmless." (citations omitted)).